# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

CHARLES RUFUS THOMLEY, II,

        Plaintiff,

    v.

RAMSEY BENNETT; LT. RALPH MILLER;
HEATHER SPRADLY; and DR. PETER
ROBLE,

        Defendants.

CIVIL ACTION NO.: 5:14-cv-73

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, who is currently housed at the Jenkins Correctional Facility in Millen, Georgia, filed a cause of action pursuant to 42 U.S.C. § 1983 contesting certain conditions of his confinement at the Pierce County Jail in Blackshear, Georgia. (Doc. 1.) Defendants Ramsey Bennett and Ralph Miller and Defendant Heather Spradley (collectively "Defendants") filed Motions for Summary Judgment. (Docs. 54, 58.) Plaintiff filed Responses. (Docs. 60, 61, 62.) For the reasons which follow, I **RECOMMEND** that the Court **GRANT** Defendants' Motions, **DISMISS** Plaintiff's Complaint, **CLOSE** this case, and **DENY** Plaintiff leave to proceed *in forma pauperis* on appeal. Plaintiff also filed a Motion in Limine, (doc. 36), and a Motion for Spoliation Sanctions, (doc. 67). As set forth below, Plaintiff's Motions are **DISMISSED AS MOOT**.

# BACKGROUND[1]

Plaintiff asserts that, while he was detained at the Pierce County Jail, he was admitted to the hospital for two (2) days and was prescribed medication for dizziness. Plaintiff contends that he was taken back to the Pierce County Jail and was placed in an upstairs cell and was not given his medication. (Doc. 1, p. 5.) Plaintiff alleges that he told the floor officer that he was suffering from dizziness, and the officer took him to see Defendant Spradley, the nurse. Plaintiff claims that Defendant Spradley ran a test on him and told him he was fine. Plaintiff contends that he asked why he had not received his medication yet, and Defendant Spradley told him Dr. Wroble had not ordered it. (Id.) Plaintiff also contends that Defendant Spradley told him to tough it out and to quit worrying.

Plaintiff avers that he was coming down the stairs later the same day when he became dizzy and fell down the stairs. (Id.) Plaintiff contends that Defendant Spradley came to the bottom of the stairs and asked him if he could get up, but he could not because pain shot through his body. (Id. at p. 7.) Plaintiff asserts that he asked Defendant Spradley to get him medical attention, but she told him she could not help him if he could not get up from the ground. Plaintiff states that he could not get up from the floor and that Defendant Spradley would not get him a neck brace or back board because the Jail did not have that equipment and left. (Id.)

Plaintiff asserts he felt it was in his best interests to call the Emergency Medical Technicians ("EMTs"). Plaintiff also states that Defendant Miller tased him in an attempt to get Plaintiff to get off the ground, which caused Plaintiff to urinate on himself. Plaintiff contends that Defendant Miller laughed at him. (Id.) Plaintiff avers that Defendant Bennett came to where he was on the floor, and Defendant Bennett refused to get him any help. Plaintiff

---

[1] The recited allegations are taken from Plaintiff's Complaint and are viewed in the light most favorable to Plaintiff, the non-moving party.

contends he later was taken back to the hospital by EMTs, where he was diagnosed with a bulging disc in his back and a separated shoulder. (Id. at p. 9.) Plaintiff's Complaint was served upon Defendants Spradley and Bennett based on Plaintiff's Eighth Amendment claims for deliberate indifference to his serious medical needs and upon Defendant Miller for an excessive use of force claim. (Doc. 16.)[2]

## DISCUSSION

Defendants Spradley and Bennett assert they are entitled to summary judgment on Plaintiff's deliberate indifference claim against them. Defendant Miller contends Plaintiff did not file a grievance concerning his claims against him for an excessive use of force, and those claims should be dismissed. In the alternative, Defendant Miller avers Plaintiff cannot sustain a viable cause of action against him. Defendants Bennett and Miller contend they are entitled to qualified immunity. In moving for summary judgment, Defendants rely on their Statements of Material Facts, a copy of the transcript from Plaintiff's depositions, Defendant Spradley's affidavit, and several exhibits attached to the deposition transcript. Plaintiff filed his own exhibits and Briefs in opposition to Defendants' Motions.[3]

---

[2] It appears Plaintiff was a pretrial detainee at the time of events giving rise to his Complaint. Thus, his deliberate indifference claims are properly analyzed under the due process clause of the Fourteenth Amendment. "Claims involving the mistreatment of pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners." Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) (internal citation and punctuation omitted), *abrogated on other grounds by* Kingsley v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2466 (June 22, 2015). Any error which may have been presented by serving Plaintiff's Complaint based on Eighth Amendment principles is harmless, as Kingsley had yet to be decided at the time of service of Plaintiff's Complaint. At that time, "decisional law involving prison inmates applie[d] equally to cases involving pretrial detainees." Bozeman, 422 F.3d at 1271 (internal punctuation omitted). As discussed in the body of this Report, Plaintiff's deliberate indifference claims will be addressed at the summary judgment stage in light of the Kingsley decision, to the extent such is necessary for the resolution of Defendants' Motions.

[3] Plaintiff failed to submit his own statement of material facts in opposition to Defendants' Statements. Plaintiff also failed to submit a declaration, affidavit, or any other statement sworn under penalty of perjury to countervail Defendant Spradley's affidavit. Plaintiff was forewarned his failure to do so would

As set forth below, the Court agrees that Plaintiff did not exhaust his available administrative remedies regarding his excessive force claim against Defendant Miller and that Plaintiff fails to establish a genuine dispute as to any fact material to his deliberate indifference claims. Thus, Defendants' Motions are due to be granted as a result.

## I. Failure to Exhaust

### A. Standard of Review

The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). "Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." Id. at 1374–75 (internal citation omitted). "Even though a failure-to-exhaust defense is non-jurisdictional, it is like" a jurisdictional defense because such a determination "ordinarily does not deal with the merits" of a particular cause of action. Id. at1374 (internal punctuation and citation omitted). Further, a judge "may resolve factual questions" in instances where exhaustion of administrative remedies is a defense before the court. Id. In these instances, "it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." Id. at 1376.

---

render the Defendants' statements admitted and accepted as true. (Doc. 16, p. 8.) The Court has, nevertheless, considered Plaintiff's argument against the grant of summary judgment in favor of Defendants, as well as his supporting documentation.

### B.  Exhaustion Requirements

#### 1.  Legal Requirements for Exhaustion

Where Congress explicitly mandates, prisoners seeking relief for alleged constitutional violations must first exhaust inmate grievance procedures before filing suit in federal court. <u>See</u> <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002).  Section 1997e(a) of Title 42 of the United States Code states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted."  In <u>Porter</u>, the United States Supreme Court held that exhaustion of available administrative remedies is mandatory. <u>Porter</u>, 534 U.S. at 523.  The Supreme Court has noted exhaustion must be "proper." <u>Woodford v. Ngo</u>, 541 U.S. 81, 92 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." <u>Id.</u> at 90–91.  In other words, an institution's requirements define what is considered exhaustion. <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007).

In <u>Turner v. Burnside</u>, 541 F.3d 1079 (11th Cir. 2008), the Eleventh Circuit set forth a "two-step process" that lower courts must employ when examining the issue of exhaustion of administrative remedies.  First, the court is to take the plaintiff's version of the facts regarding exhaustion as true. <u>Id.</u> at 1082.  If, even under the plaintiff's version of the facts, the plaintiff has not exhausted, the complaint must be dismissed. <u>Id.</u>  However, if the parties' conflicting facts leave a dispute as to whether plaintiff has exhausted, the court need not accept all of plaintiff's facts as true. <u>Id.</u>  Rather, "the court then proceeds to make specific findings in order to resolve the disputed factual issues[.]" <u>Id.</u>  "Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available

administrative remedies." Id. at 1083. The Eleventh Circuit has held that a district court may consider materials outside of the pleadings and resolve factual disputes regarding exhaustion in conjunction with a Rule 12(b)(6) motion to dismiss so long as the factual disputes do not decide the merits of the case. See Bryant, 530 F.3d at 1376–77.

The requirement that the exhaustion of remedies occur "first in an agency setting allows 'the agency [to] develop the necessary factual background upon which decisions should be based' and giv[es] 'the agency a chance to discover and correct its own errors.'" Green v. Sec'y for Dep't of Corr., 212 F. App'x 869, 871 (11th Cir. 2006) (quoting Alexander v. Hawk, 159 F.3d 1321, 1327 (11th Cir. 1998) (first alteration in original)). "However, 'while [Section] 1997e(a) requires that a prisoner provide as much relevant information as he reasonably can in the administrative grievance process, it does not require more.'" Id. (quoting Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000)). Nevertheless, the purpose of Section 1997e(a) is not that "fact-intensive litigation" result over whether every fact relevant to the cause of action was included in the grievance. Hooks v. Rich, CV605-65, 2006 WL 565909, at *5 (S.D. Ga. Mar. 7, 2006) (internal citation omitted). "'As long as the basic purposes of exhaustion are fulfilled, there does not appear to be any reason to require a prisoner plaintiff to present fully developed legal and factual claims at the administrative level.'" Id. (quoting Irvin v. Zamora, 161 F. Supp. 2d 1125, 1135 (S.D. Cal. 2001)). Rather, Section 1997e(a) is intended to force inmates to give state prison authorities a chance to correct constitutional violations in their prisons before resorting to federal suit and to prevent patently frivolous lawsuits. Id.

2.    Pierce County Jail Grievance Procedures

Policy Number 5.21 of the Georgia Jail Standards sets forth the grievance procedure which was in place at Pierce County Jail in July 2014. An inmate is allowed to file a grievance

under this procedure except in cases concerning matters over which the Pierce County Detention Center has no control, disciplinary actions, or routine administrative transfers. (Doc. 55-3, p. 2.) If the inmate is complaining about a violation of his civil rights, the detention officer who is given the grievance is to "refer the inmate to the formal grievance system and shall not attempt to resolve the complaint informally." (Id. at p. 3.) In the event the inmate's complaint is not handled informally, "he may file a written grievance within five days of discovery or when he reasonably should have discovered the incident." (Id.) The grievance "shall state fully the time, date, names of facility staff and inmates involved, witnesses, and a narrative of the incident." (Id.) The grievance coordinator is to order an investigation of the incident within 24 hours of receipt of the grievance, and the grievance coordinator is to provide a response within fifteen days of receipt of the grievance. Once the inmate receives the formal response to his grievance, he has three calendar days "to accept the findings and action taken, and so acknowledge by signature, or appeal to the facility administrator." (Id. at pp. 3–4.) The facility administrator has ten days to concur with the grievance coordinator's response, request further investigation, or provide his own solution. Once the facility administrator responds to the appeal, the grievance procedure is terminated. (Id. at p. 4.)

With these standards and procedures in mind, the Court now addresses Defendant Miller's argument that Plaintiff did not exhaust his administrative remedies as to his excessive force claim.

3.      Assessment of Plaintiff's Exhaustion (Excessive Force Claim)[4]

Defendant Miller asserts Plaintiff "was clearly aware" of the grievance process in place at the Pierce County Jail because he filed nineteen Inmate Request Forms and/or Inmate Grievance Forms from July 10, 2014, until his transfer to Lowndes County Jail in Valdosta, Georgia, on October 3, 2014.  (Doc. 54-2, p. 11.)  Defendant Miller maintains Plaintiff mentions the July 10, 2014, incident on only one request form, which was submitted on September 29, 2014, more than two months after this alleged incident.  Defendant Miller avers Plaintiff did not file a grievance within the five day window set forth by Grievance Procedure 5.21, and he, therefore, failed to exhaust his administrative remedies as to his excessive force claim against Defendant Miller.

Plaintiff asserts in his Complaint that he filed a grievance about the events giving rise to his cause of action.  (Doc. 1, p. 5.)  However, Plaintiff offers nothing in response to Defendant Miller's assertion that Plaintiff failed to exhaust his administrative remedies as to his excessive force claim.  The Court nevertheless will assess Plaintiff's exhaustion by utilizing the documents Defendant Miller submitted in support of his position.[5]

The Court notes Plaintiff's assertions in his Complaint that he submitted a grievance but did not appeal because he never received a response to that grievance and that he repeated this process a second time without a response.  (Doc. 1, p. 4.)  The Court takes Plaintiff's version as

_____

[4]   It does not appear Plaintiff exhausted his available administrative remedies as to his deliberate indifference claims against Defendants Bennett and Spradley based on Defendants' submissions. However, Defendants did not raise this issue in their Motions.  Out of an abundance of caution, the Court shall address the parties' arguments regarding Plaintiff's deliberate indifference claims in the body of this Report.  Further, it may be that Plaintiff did file a grievance form about his medical care and treatment prior to July 10, 2014, as all of the submitted requests are dated from July 10, 2014, forward, but Defendants did not include these requests in light of the assertion Plaintiff failed to exhaust his administrative remedies as to Defendant Miller only.  (Doc. 55-4.)

[5]   In so doing, the Court will only note the dates and/or subject matter relevant to this portion of the pending Motions.

true, and under Plaintiff's version of events, he exhausted his available administrative remedies. However, Defendant Miller contends Plaintiff did not exhaust his available administrative remedies and has submitted documentation in support of this contention. Because the parties present the Court with conflicting facts on the issue of Plaintiff's exhaustion regarding his excessive force claim, the Court must resolve this dispute. Turner, 541 F.3d at 1083.

Plaintiff submitted an Inmate Request Form on July 10, 2014, requesting to make a legal call. Plaintiff was permitted to make this call. (Doc. 55-4, p. 2.) On September 29, 2014, Plaintiff submitted another Inmate Request Form and stated he would like to press charges against Defendants Bennett and Miller "for the incident that happened on 07-10-14 where I was attacked while laying defenseless and neglected and abused by this Sheriff's Dept." (Id. at p. 16.) Plaintiff requested the proper paperwork so that he could make a formal complaint against Defendants Miller and Bennett and was directed to consult his lawyer. Plaintiff also filed three grievances beginning on September 23, 2014. He complained about his tooth and his need for medical attention for his tooth in two of these grievances and about his mail being opened in the third grievance. (Id. at pp. 18–20.)

There is no evidence before the Court indicating that Plaintiff properly exhausted his administrative remedies relating to his excessive force claim against Defendant Miller or any other of the occurrences of July 10, 2014. Instead, the only evidence before the Court is that Plaintiff submitted an Inmate Request Form on September 29, 2014, in an effort to obtain paperwork to file criminal charges against Defendants Miller and Bennett. (Doc. 55-4, p. 16.) Plaintiff has offered nothing to refute Defendant Miller's contentions in this regard. Thus, using the Turner analysis, it is clear Plaintiff failed to exhaust his available administrative remedies pertaining to his excessive force claims against Defendant Miller. The Court should **GRANT**

this portion of Defendants Bennett's and Miller's Motion and **DISMISS** Plaintiff's excessive force claim against Defendant Miller without prejudice.

## II.     Deliberate Indifference Claims

### A.     Standard of Review

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  However, there must exist a conflict in substantial evidence to pose a jury question."  Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law.  See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex v. Catrett, 477 U.S. 317, 322–23 (1986)).  In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable

to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., Fla., 630 F.3d 1346, 1353 (11th Cir. 2011).

> **B.      The Parties' Contentions Regarding Whether Defendants Spradley and Bennett were Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Defendants[6] contend Plaintiff received medical treatment, although it may not have been the medical treatment he wanted or thought he needed. Defendants assert Plaintiff was seen by medical personnel from either the Mayo Clinic in Waycross, Georgia, or the Pierce County Jail every day from July 6 to July 11, 2014, which was the day after he fell down the stairs and when he returned to the Jail from his second trip to the Mayo Clinic. (Doc. 54-2, p. 4.) Defendants state Plaintiff acknowledges that he received treatment after he fell, and his claims are that the medical treatment provided was deficient and that Defendants delayed in getting the EMTs to the Jail. However, Defendants assert that Plaintiff cannot sustain any claim that a delay in medical treatment exacerbated his condition, as he has no verifying medical evidence to support such a claim.

Defendant Bennett maintains Plaintiff cannot sustain his claims against him, even if Plaintiff could show the medical treatment he received was objectively deficient. Defendant Bennett avers there is no evidence he was subjectively aware of any known risk to Plaintiff's medical needs or that the treatment provided by medical personnel was in some way deficient. In addition, Defendant Bennett states he is the one who directed that the EMTs be called. (Doc. 54-2, p. 8.)

Plaintiff responds that personnel at the Mayo Clinic gave Defendant Miller his release papers and after care treatment plan on July 8, 2014, to ensure Plaintiff would receive the

---

[6]    Based on the recommended dismissal of Plaintiff's claim against Defendant Miller, the use of "Defendants" in discussion of Plaintiff's deliberate indifference claims refers to Defendants Bennett and Spradley, unless otherwise noted.

medication he was prescribed for his dizziness. However, Plaintiff contends he was denied his prescription medication. Plaintiff also contends he went to the medical unit on July 9, 2014, in an attempt to be moved from his upstairs cell, and Defendant Spradley was capable of housing him in a cell that would have been safe for him since she knew he was suffering from dizziness. (Doc. 60, p. 2; Doc. 62, p. 1.) Plaintiff asserts that he also inquired about the prescribed medication he was to receive, and Defendant Spradley told him his medication had not been ordered yet. Plaintiff asserts he was in the medical unit for only four minutes, which indicates Defendant Spradley was trying "to blow [him] off with a lame excuse[.]" (Doc. 60, p. 2.)

Plaintiff avers he went back to the medical unit on July 10, 2014, at which time Defendant Spradley ran an EKG on him, told him he was fine, and told him to quit worrying. Plaintiff asserts he once again asked about his medication and being moved, and "lies and lame excuses and false promises were made." (Id. at p. 3.) Plaintiff contends that, also on July 10, 2014, he was sent back to his dorm after being in the medical unit for eleven minutes, and his upstairs dorm was a location that was "clearly a hazard and danger" to him "with his known medical condition." (Id. at p. 5.) According to Plaintiff, Defendants had a duty to provide him with adequate medical care to guarantee his safety. Plaintiff maintains that he fell on the stairs on July 10, 2014, as a direct result of not receiving his doctor-prescribed medication for two full days, which was the responsibility of Defendants, who were in control of his care. Plaintiff contends he received a bulging disc in his back and a separated shoulder due to this fall. Plaintiff asserts he was made to lie on the stairs in an uncomfortable and damaging position, and Defendants were aware of his situation, yet they ignored his pleading for help and left him to endure pain and worsened his condition by prolonging his treatment. (Id. at p. 9.)

Plaintiff's allegations and Defendants' Motions give rise to a discussion of the Fourteenth Amendment, as well as a discussion of the Eighth Amendment.

### C. Applicable Legal Standards

#### 1. Kingsley and its Application

In Kingsley, the Supreme Court determined that a pretrial detainee alleging a violation of his constitutional rights must show, under the Fourteenth Amendment's due process clause, that an officer's actions in an excessive use of force claim were objectively unreasonable. ___ U.S. at ___, 135 S. Ct. at 2472–73. In other words, a pretrial detainee need not prove what a defendant's state of mind was at the time of the alleged constitutional violation, i.e., the subjective component in a typical Eighth Amendment excessive use of force claim alleged by a convicted prisoner. Id. The Court cautioned "[a] court (judge or jury) cannot apply this standard mechanically." Id. at ___, 135 S. Ct. at 2473 (citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 850 (1998)). "Rather, objective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

In light of the Kingsley decision, several courts have discussed its application to claims made by pretrial detainees involving deliberate indifference allegations.[7] However, it does not appear that Kingsley provides the standard which is to be applied in this case.

---

[7] The Eleventh Circuit has yet to issue a ruling on the proper standard to employ in analyzing a pretrial detainee's deliberate indifference claim in light of the Kingsley decision. Because of this, the Court applies the standards in place at the time giving rise to the events set forth in Plaintiff's Complaint. First, the parties have not been put on notice the Court would apply a different standard to Plaintiff's deliberate indifference claims and thus, have not briefed the issue on the basis of an objective reasonableness test. See Hentschel v. Rockingham Cty. Dep't of Corr., Case No. 15-cv-215-SM, 2015 WL 8489610, at *1 n.1 (D.N.H. Nov. 20, 2015) (noting it is unclear what standard to use for a pretrial detainee's deliberate indifference claim in Kingsley's wake but declining to apply Kingsley because the parties had not briefed that issue). In addition, even if a pretrial detainee's deliberate indifference claims are to be analyzed using the Fourteenth Amendment's due process clause rather than the Eighth Amendment's deliberate indifference standard, the facts of this case lead to the conclusion Defendants nevertheless would be entitled to summary judgment. As discussed in this Report, infra., Plaintiff fails to establish genuine disputes as to any fact material to his deliberate indifference claims under an objectively reasonable

2.  Legal Standards at the Time of Events Giving Rise to Plaintiff's Complaint

The Eighth Amendment's proscription against cruel and unusual punishment imposes a constitutional duty upon prison officials to take reasonable measures to guarantee the safety of prison inmates.  This duty to safeguard also embodies the principle expressed by the Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), forbidding prison officials from demonstrating deliberate indifference to the serious medical needs of inmates.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle, 429 U.S. at 105).  Rather, "an inmate must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

To prevail on a deliberate indifference claim, a pretrial detainee must demonstrate "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010).  A medical need is serious if it "'has been diagnosed by a physician as *mandating* treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir.

---

standard.  Further, because the standard applicable at the time giving rise to Plaintiff's Complaint was the Eighth Amendment's deliberate indifference standard, Defendants would likely be entitled to qualified immunity, as Kingsley was not the clearly established law at that time.  Ross v. Corr. Officers John & Jane Does 1–5, 610 F. App'x 75, 77 n.1 (2d Cir. 2015) ("Because our focus, in analyzing whether qualified immunity applies, is on whether the right asserted by Ross was clearly established at the time of the alleged violation, we need not address Kingsley's possible implications for deliberate indifference claims brought by pre-trial detainees."); see also Bilal v. Geo Care, LLC, Case No. 2:14-cv-422-FtM-38MRM, 2016 WL 345514, at * 6 (M.D. Fla. Jan. 28, 2016) (recognizing the Kingsley decision and stating, "[i]n the context of conditions of confinement cases, the Eighth Amendment is concerned with deprivations of essentials, food, medical care, or sanitation or other conditions intolerable for prison confinement. . . . The relevant state of mind for a condition claim is deliberate indifference.") (citations omitted).

2007) (quoting Hill, 40 F.3d at 1187) (emphasis supplied). As for the subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995). Under the subjective prong, an inmate "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Goebert, 510 F.3d at 1327.

### D. Application of Legal Standards to the Evidence Presented

In her affidavit and in her Nurse's Notes, Defendant Spradley states her daily duties consisted primarily of meeting with inmates who made sick call requests, dispensing physician-approved medications and some over-the-counter medications, such as Tylenol and aspirin, and being available if there was a medical emergency.[8] (Doc. 58-3, p. 3.) Defendant Spradley declares she would assess an inmate's complaint during a sick call visit and report her observations to Dr. Wrobel, who in turn would evaluate the complaint, review the inmate's medical history, and give instructions as to medical treatment.[9] Defendant Spradley states she was not permitted to dispense any prescription medications which Dr. Wrobel had not authorized to be filled, she was required to be supervised by a licensed physician and was bound by the physician's orders, and was not allowed to treat patients without this supervision, per SCM policy and Jail procedures. (Id. at pp. 3–4.) In the event of a medical emergency, Defendant

---

[8] Defendant Spradley's affidavit echoes her Nurse's Notes. The Court will not address these filings separately, as to do so would be redundant. However, the Court has cited to both filings where appropriate. In addition, it appears Defendant Spradley's Brief in Support of her Motion draws largely from these filings.

[9] Southern Correctional Medicine ("SCM") provides various medical services to correctional facilities throughout southern Georgia, including Pierce County Jail. Dr. Peter Wrobel was the principal and medical director for SCM and supervised all of the medical treatment administered to inmates at the Jail at the time giving rise to the events forming the basis of Plaintiff's Complaint. Dr. Wrobel attended appointments at the Jail once a week and was otherwise on call for any medical issues which arose. (Doc. 58-1, pp. 2–3.) Per SCM and Jail protocol, Defendant Spradley was not permitted to dispense prescription medications at the Jail which Dr. Wrobel had yet to authorize to be filled.

15

Spradley declares she would assess the inmate's medical issue, take his vital signs, and call Dr. Wrobel, who would provide instructions regarding medical treatment after review of the situation and the inmate's medical history. (Id. at p. 5.) Defendant Spradley also declares she was forbidden from calling EMTs to the Jail, unless the inmate was suffering from a life-threatening emergency, such as a heart attack or significant bleeding. (Id.)

Defendant Spradley notes Plaintiff was taken to the Mayo Clinic in Waycross, Georgia, on July 6, 2014, with complaints of chest pain and dizziness and was discharged two days later after a cardiologist cleared him and wrote him a prescription for dizziness medication. Defendant Spradley attests that she checked on Plaintiff on July 9, 2014, after his return from the Mayo Clinic on July 8, 2014, to see whether he was feeling better and to tell him to inform her if he had any problems. Defendant Spradley told Plaintiff to relax and sent him back to his cell. (Doc. 58-4, p. 65.) Defendant Spradley alerted Dr. Wrobel at 2:13 p.m. that Plaintiff had been prescribed medication by the doctor at the hospital, but "no medications were given at this time. Will continue to monitor." (Doc. 55-5, p. 2; Doc. 58-4, p. 65.)

At 9:11 on the morning of July 10, 2014, Defendant Spradley declares Plaintiff came to the medical unit during a sick call complaining of chest pain. After she performed an EKG, Dr. Wrobel concluded the results were normal. (Doc. 58-4, p. 66.) Defendant Spradley states Plaintiff asked her when he would receive his medication, and she told him Dr. Wrobel had not approved the filling of his prescription yet. Defendant Spradley declares she learned Plaintiff had fallen down a staircase at approximately 2:00 p.m. that same day, despite Plaintiff never telling her he had problems walking up and down the stairs. (Doc. 58-3, p. 6.) Defendant Spradley also declares Plaintiff was on the bottom step of the staircase when she arrived at the scene and was complaining about back pain. Further, Defendant Spradley states she tried to

assess Plaintiff's condition and examine his back, but he refused to allow her to do so.  (Id.; Doc. 58-4, p. 66.)  Defendant Spradley observed Plaintiff was awake and alert, his pulse was 91, and his blood pressure was 170/100.  Defendant Spradley also noted Plaintiff had two to three-second refill in his capillaries and strong pedal pulses and was moving his head, arms, and upper shoulders.  (Doc. 58-4, p. 66.)

When she called Dr. Wrobel to report her limited assessment, Dr. Wrobel told her to have Plaintiff go to the medical unit.  Plaintiff refused to go, according to Defendant Spradley, because he did not want to "move and do damage."  (Doc. 58-3, p. 6; Doc. 55-5, p. 3; Doc. 58-4, p. 66.)  Defendant Spradley avers Dr. Wrobel told her to call him back in thirty minutes with an update on Plaintiff's condition and that she stayed with Plaintiff the entire 30-minute duration, during which time Plaintiff once again refused to allow her to examine him.  Defendant Spradley also states Plaintiff asked to be placed on a backboard with a neck brace during this thirty-minute time period, and she told him the Jail did not have this equipment available.  Defendant Spradley declares she called Dr. Wrobel again, and he instructed Jail officials to check on Plaintiff every fifteen minutes.  Defendant Spradley contends she was able to observe Plaintiff from a window in the housing area, was in constant contact with Dr. Wrobel, and checked on Plaintiff "numerous times."  (Doc. 58-3, p. 7.)  Plaintiff asked that she and the Jail officials call the EMTs on several occasions, but she was not authorized to do so because Plaintiff was not in the throes of a life-threatening emergency.  Defendant Spradley states she remained at the Jail for approximately two and a half hours after her shift ended "for the specific purposes of continuing to monitor and attempting to assess Plaintiff's medical condition."  (Id.)  Defendant Spradley noted Plaintiff had come back from the hospital and was placed in a holding cell until her arrival on July 11, 2014, and for observation.  Plaintiff reported he was "okay just a little sore."

(Doc. 55-5, p. 5; Doc. 58-4, p. 68.)  Defendant Spradley attests to her belief that Plaintiff was not suffering from any serious medical harm or had a serious medical need and that she acted in accordance with SCM and Jail policies and professional standards governing licensed professional nurses.  (Doc. 58-3, p. 6.)

Another nurse, Rita McNeal, also completed a "Nurse Note" at 7:00 p.m. on July 10, 2014, and stated she was called in to check on Plaintiff because he had fallen earlier that day. (Doc. 55-5, p. 4; Doc. 58-4, p. 67.)  Ms. McNeal stated she saw Plaintiff lying on his back at the bottom of the stairs, talking to officers and other inmates, and moving his head, arms, and feet. Plaintiff told her he was not moving from the stairs until the EMTs were there to place him on a backboard, give him a neck brace, and take him to the emergency room.  Plaintiff also told Ms. McNeal his lower back was hurting "real bad[,]" he had no numbness in his feet and legs, and he had no loss of consciousness or dizziness.  (Doc. 55-5, p. 4; Doc. 58-4, p. 67.)  Ms. McNeal detected no signed of an open wound or bleeding, and she observed Plaintiff had good pedal pulses and normal capillary refill in both feet, which were warm to the touch.  Plaintiff refused any further evaluation at that time and wanted the EMTs to be called.

Ms. McNeal noted Plaintiff raised his head and neck to talk to her, and she also noted movement in his arms and feet.[10]  Plaintiff still refused to allow Ms. McNeal to complete her evaluation.  Ms. McNeal called Dr. Wrobel, who advised her to get a backboard[11], place Plaintiff on it, and transfer him to the medical unit.  According to Ms. McNeal, Plaintiff refused and said only the EMTs were going to touch him.  Upon being advised of Plaintiff's continued refusal,

---

[10]  Plaintiff admitted during his deposition he was moving his arms and was able to move his head. (Doc. 55-1, pp. 38, 69.)

[11]  Given Defendant Spradley's and Plaintiff's accounts, Plaintiff was told the Jail did not have a backboard.  Either Ms. McNeal or Dr. Wrobel was mistaken, or Ms. McNeal intended to write "stretcher" or "gurney" rather than "backboard".  In any event, this discrepancy does not create a genuine dispute as to any fact material to Plaintiff's deliberate indifference claims.

Dr. Wrobel told Ms. McNeal to leave Plaintiff where he was and have officers check on him every thirty minutes. Plaintiff then said, "'I will die on these stairs before I let yall [sic] (myself and officers) touch me and Ramsey Bennett (sheriff) would have that on his conscious [sic] for the rest of his life.'" (Doc. 55-5, p. 4; Doc. 58-4, p. 67.) At this time, Defendant Bennett was called to update him on the situation and made the decision to call the EMTs to have Plaintiff taken to the emergency room for evaluation. Dr. Wrobel was advised of Defendant Bennett's decision.

The parties also submitted copies of Plaintiff's medical records from the Mayo Clinic. Plaintiff was admitted on July 6, 2014, complaining of chest pain and dizziness. On July 8, 2014, Plaintiff had an EKG, which was normal. Plaintiff also had a CT scan of his head, which revealed normal findings. Plaintiff was discharged after being prescribed medications for pain and dizziness, as needed. (Docs. 60-1, 61-1, pp. 1–2, 6, 8.) After Plaintiff's fall on July 10, 2014, he once again was seen at the Mayo Clinic, complaining of lumbar and right shoulder pain. The physical examination revealed back pain and full range of motion with pain in his right shoulder. Plaintiff had an x-ray of his shoulder, which revealed "no acute findings. Clavical osteolysis," and the x-ray of his lumbar also revealed no acute findings. Likewise, the CT of Plaintiff's lumbar revealed no acute findings. (Doc. 58-7, p. 4; Docs. 60-1, 61-1, p. 12.)

During his deposition, Plaintiff testified that he saw the nurse (presumably Defendant Spradley) on the morning of July 10, 2014, and told her he needed his medication and asked her to move him "somewhere" because he was "suffering from dizziness."[12] (Doc. 55-1, p. 32.) Plaintiff admitted he asked to go to medical that morning and was able to see a nurse. Plaintiff also testified that he was not sure who was supposed to fill his prescription, but if Defendant

---

[12] Plaintiff also testified that he only informed Defendant Miller upon his return to Pierce County Jail on July 8, 2014, that he needed to be in a different cell. According to Plaintiff, Defendant Miller told him medical personnel were in charge of that decision. (Doc. 55-1, p. 101.)

Spradley was aware of his medical problem and it was in her authority to do something about it, she should have.[13] (Id. at p. 33.) Plaintiff later testified he understood Defendant Spradley was not who was in charge of ordering medications, but he did not understand why she had him go back upstairs. (Id. at pp. 35–36.) Plaintiff stated that, once he went back to his cell, he laid down for a bit because he felt dizzy, but he had to go up and down the stairs to eat, watch television, to use the phone, or to even take a bath. (Id. at p. 40.) Plaintiff stated he had gone up and down the stairs more than once without incident before he fell. (Id. at p. 52.) Plaintiff also stated he told the floor officers he was feeling dizzy after Defendant Spradley had seen him that morning, but he never told Defendant Spradley he was having issues walking down the stairs. (Doc. 55-2, pp. 16–17.)

When Plaintiff fell down the stairs, Defendant Spradley was one of the first people on the scene. She "checked [him] out" by checking his pulse and blood pressure and asked him if he could stand. (Doc. 55-1, p. 41; Doc. 55-2, p. 19.) Plaintiff stated he tried to move, but a pain shot through his back and down his leg, so he told her he could not move. Defendant Spradley told Plaintiff she could not help him if he could not get up, and she sat with him for a few minutes, talking with him, and checked him out again before leaving. Plaintiff asserts he was on the stairs crying and asking for help, and Defendant Bennett said "he wanted justice." (Doc. 55-1, p. 51.) When asked more about this, Plaintiff said Defendant Bennett was only in the room on one occasion, and Plaintiff had no idea if Defendant Spradley told Defendant Bennett of his

---

[13] Conversely, Plaintiff later stated he asked Defendant Spradley about getting his medication on July 10, 2014, at which time she told him Dr. Wrobel had not ordered it yet but he would get his medication. Plaintiff repeatedly stated Defendant Spradley could not give him medication which had not been filled and that Dr. Wrobel had not gotten around to ordering it yet. (Doc. 55-2, pp. 6–7, 9.) Plaintiff further stated he had no idea whether Defendant Spradley actually had the authority to move him to another cell, as she told him she did not, whereas Defendant Miller told him she did. (Id. at pp. 1–3, 5.) In addition, Plaintiff testified that he was not sure whether there were any available cells on the bottom floor. (Id. at p. 15.)

condition, yet Defendant Bennett insisted there was nothing wrong with Plaintiff. (Id. at p. 64.) Plaintiff testified that two officers stayed in the general area for a little while and spoke to him, and he was able to eat a biscuit and drink some water. (Id. at pp. 58–59.) During this time, Defendant Spradley kept coming in until he heard Defendant Bennett speak over the intercom that the jailors could watch Plaintiff on the camera. (Id. at pp. 60–61.) Plaintiff admitted it was possible personnel checked on him by viewing him on camera.

At one point, Officer Travis Miller offered to help Plaintiff to get off of the stairs. While Plaintiff denied refusing to get up, he stated he told Officer Miller he could not move and that he "felt it was in my best interest that—if they got a neck [brace] and back[board]." (Id. at p. 66.) Plaintiff stated Defendant Spradley told him the Jail did not have that kind of equipment. Plaintiff testified he had no knowledge whether Defendant Spradley spoke with Dr. Wrobel or about what they discussed, nor did he have knowledge if Defendant Spradley passed along any information to Jail personnel. (Id. at pp. 75–76.) Plaintiff testified that, even if Defendant Bennett had called the EMTs to come get him, making him lay down on the stairs for six hours was "harsh." (Id. at p. 79.) Plaintiff reiterated that his complaint boils down to being left on the stairs for hours while he was in pain instead of getting him what he deemed "proper medical attention" or "proper, adequate medical attention," i.e., calling the EMTs. (Doc. 55-2, pp. 24, 80.) Plaintiff stated he also complains about the delay in getting what he deemed proper medical attention. (Id. at p. 93.) Plaintiff testified Defendant Spradley offered to take him to the medical unit four times, but he felt the offer was not any good because she could not actually get him there, even though she offered to take him in a wheelchair. (Id. at pp. 30, 37.)

1.     Conclusions Regarding Events Before Plaintiff's Fall

Even viewing the evidence in the light most favorable to Plaintiff, he fails to establish a genuine dispute as to any fact material to his deliberate indifference claims against Defendants concerning events prior to his fall. Instead, the evidence reveals that Plaintiff is dissatisfied with the level of care he received as a result of his alleged dizziness and lack of purportedly necessary medication on July 10, 2014. The Court notes Plaintiff's contentions that he went to the medical unit that morning and complained about being dizzy and that Defendant Spradley could not give him the medication for his condition because it had not yet been ordered. However, there is no evidence Plaintiff informed Defendant Spradley he was having trouble going up and down the stairs or that she otherwise knew of any problems Plaintiff was experiencing. Rather, Plaintiff testified that he told the floor officers he was having trouble, and there is no indication—other than from Plaintiff's Complaint—such concerns were relayed to Defendants. Moreover, Plaintiff made a telephone call later that morning, which required him to climb down the stairs and back up again, (docs. 60-1, 61-1, p. 77), and there is no evidence he had trouble doing so at that time. Consequently, Plaintiff has failed to show that Defendants were aware, objectively or subjectively, of a serious risk to Plaintiff's health and safety prior to his fall.

Further, there is no supported evidence that the medication Plaintiff was prescribed was necessary since this medication was prescribed on an as needed (or "PRN") basis.[14] (Doc. 60-1, p. 1.) Moreover, Plaintiff admits that Defendant Spradley was not able to obtain the medication Plaintiff professed to need on that day. The facts are undisputed that Defendant Spradley could not fill the prescription herself. Moreover, Plaintiff admits that he has no idea whether Defendant Spradley had the authority to move him from his upstairs cell to a cell downstairs. Plaintiff cannot establish a genuine dispute as to whether Defendants' actions or inaction caused

---

[14] http://medical-dictionary.thefreedictionary.com/p.r.n, last accessed Feb. 3, 2016.

him to fall. <u>McDaniels v. Lee</u>, 405 F. App'x 456, 458 (11th Cir. 2010) ("To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury.") (citing <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1306–07 (11th Cir. 2009)). In other words, Plaintiff fails to show that, assuming he had a serious medical need, Defendants were aware of any risk posed by not being moved to another cell or by not getting his medications and that Defendants' deliberate indifference caused Plaintiff any injury.

2. Events Occurring After Plaintiff's Fall

As to Plaintiff's claims regarding events after his fall, Plaintiff specifically asserts that Defendant Spradley offered to help him on several occasions after he fell. Plaintiff makes much ado about whether he refused Defendant Spradley's offer or whether he simply was physically unable to get up from the stairs without having a backboard or a neck brace. However, the semantics of this point of contention are not actually material to any fact relevant to Plaintiff's deliberate indifference claims. The undisputed evidence reveals that Defendant Spradley offered medical treatment to Plaintiff on several occasions, and Plaintiff did not accept these offers—for whatever reason. Defendant Spradley repeatedly monitored and assessed Plaintiff and even stayed after her shift was completed to continue to assess his condition. Moreover, Defendant Spradley repeatedly offered treatment to Plaintiff which, for whatever reason, Plaintiff declined.

Plaintiff's assertions and the evidence do not support a finding of a genuine dispute as to whether Defendant Spradley was objectively indifferent to Plaintiff's medical needs. Instead, Plaintiff's complaint lies, as he readily admitted, with not getting what he deemed to be proper medical attention after his fall. This is an insufficient basis for viable deliberate indifference claims under the Eighth or Fourteenth Amendment. <u>Wilson v. Smith</u>, 567 F. App'x 676, 678

(11th Cir. 2014) ("[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" does not support a claim of deliberate indifference. Moreover, matters of medical judgment do not constitute deliberate indifference.") (citing Harris v. Thigpen, 941 F.2d 1495, 1501 (11th Cir. 1991), and Estelle, 429 U.S. at 107). In addition, Plaintiff does not refute Defendant Spradley's averment that she was acting within the parameters of SCM and Jail policies and procedures. Cf. Losey v. Warden, 521 F. App'x 717, 720 (11th Cir. 2013) ("'[F]ailure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence.' It would be a different situation if the policy that [defendants] failed to follow put them on notice that their actions would create a substantial risk of serious harm to inmates, but [plaintiff] makes no such allegation.") (quoting Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000)).

3.      Perceived Delay in Obtaining Treatment by Defendant Bennett

As for Defendant Bennett, the evidence bears out that the crux of Plaintiff's complaint against him concerns the perceived delay in obtaining medical treatment following his fall down the stairs. At most, the evidence reveals Defendant Bennett saw Plaintiff after he fell on one occasion and believed there was nothing wrong with Plaintiff, despite Plaintiff's assertion he was screaming and begging for help. However, there is no evidence that Defendant Bennett was subjectively aware that Plaintiff was suffering from a serious medical need and acted in an objectively unreasonable manner. In fact, Plaintiff admitted during his deposition he had no knowledge whether Defendant Bennett was aware of Plaintiff's alleged medical needs or whether Defendant Bennett thought Plaintiff was faking his injuries. (Doc. 55-1, p. 65; Doc. 55-2, pp. 88–89.) Additionally, the only evidence as to who called the EMTs, even after Plaintiff was purportedly lying on the stairs for six hours' time, reveals Defendant Bennett called the

EMTs. The evidence also bears that the EMTs arrived at the Jail not long after Defendant Bennett called them to transport Plaintiff to the emergency room. Moreover, Defendant Bennett did not leave Plaintiff bereft of medical treatment, as Defendant Spradley was continually monitoring and assessing Plaintiff and offering treatment to Plaintiff (which Plaintiff refused).

To the extent Plaintiff maintains the delay in calling the EMTs exacerbated his conditions, the evidence before the Court does not support such a contention. To prove a delay in providing medical treatment caused harm, a plaintiff must present evidence of: "'(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay.'" Keele v. Glynn Cty., Ga., 938 F. Supp. 2d 1270, 1292 (S.D. Ga. 2013) (quoting Goebert, 510 F.3d at 1327). However, "'accidental inadequacy, negligence in diagnosis or treatment, [and] medical malpractice'" are insufficient to sustain a claim of deliberate indifference. Id. (alteration in original) (quoting Nimmons v. Aviles, 409 F. App'x 295, 297 (11th Cir. 2011)). In addition, a plaintiff who asserts that a delay in obtaining medical treatment amounts to a constitutional violation is required to submit verifying medical evidence into the record "to establish the detrimental effect of [any] delay in medical treatment to succeed." McDaniels v. Lee, 405 F. App'x 456, 458–59 (11th Cir. 2010) (internal citation omitted). What medical evidence is of record shows that there were no acute findings of injury as to Plaintiff's shoulder or his lower back.[15] This evidence refutes any contention that any alleged delay in getting Plaintiff transported by EMTs to the Mayo Clinic exacerbated any condition from which he suffered.

---

[15] "Acute" refers to a health condition, usually of rapid onset and is sometimes used to mean "severe." http://www.medilexicon.com/medicaldictionary.php?t=1007, last accessed Feb. 3, 2016. Because Plaintiff's medical records reveal "no acute findings," it follows that Plaintiff's bulging disc and clavical osteolysis did not occur immediately preceding these tests. Instead, these injuries appear to have occurred prior to July 10, 2014. Even if these injuries had occurred on July 10, 2014, there is still no evidence that any perceived delay contributed to or worsened Plaintiff's conditions.

In sum, Plaintiff fails to establish the existence of a genuine dispute as to any fact material to his deliberate indifference claims. Accordingly, it is unnecessary to address the qualified immunity portions of Defendants' Motions. <u>Martinez v. Burns</u>, 459 F. App'x 849, 851 (11th Cir. 2012) (a qualified immunity defense need not be addressed if the plaintiff cannot sustain an underlying constitutional claim).

## III.    Motion in Limine (Doc. 36)

Plaintiff contends Defendants will attempt to introduce evidence of or make reference to his convictions for burglary, theft by taking, and criminal trespassing in 1997 and for criminal trespassing in 2007 and in 2013. (Doc. 36, p. 1.) Plaintiff contends his convictions for these offenses are unrelated to his present cause of action, and introduction of this evidence would do nothing other than place his character at issue. Plaintiff also contends allowing Defendants to introduce such evidence would be highly prejudicial. Defendants respond that, in the event of a trial, they intend to use evidence of Plaintiff's criminal convictions only to the extent permissible under the Federal Rules of Evidence.

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a). An exception to this general rule is that evidence of a witness' character may be admitted under Rule 609. Rule 609 of the Federal Rules of Evidence allows a person to be impeached by evidence of a criminal conviction. Provided the probative value of evidence of a criminal conviction is not outweighed by its danger of unfair prejudice, this evidence "must be admitted[ ]" in a civil case if the crime was punishable by imprisonment of more than a year's time or death or if the elements of the crime required proof of a dishonest act or statement. Fed. R. Evid. 609(a)(1)(A), (2). In the event that more than ten years have passed since the

conviction or release from confinement, such evidence in only admissible if its probative value substantially outweighs its prejudicial effect and the proponent of this evidence gives reasonable written notice of the intent to use this evidence. Fed. R. Evid. 609(b).

Given the recommendation that the Court grant Defendants' Motions for Summary Judgment and dismiss Plaintiff's Complaint, Plaintiff's Motion in Limine is **DISMISSED** as moot at this time. However, in the event the Court rejects this recommendation and denies Defendants' Motions for Summary Judgment, the Court cannot rule on Plaintiff's Motion in Limine. Without any context for the introduction of evidence of Plaintiff's criminal convictions at any putative trial in this case, the Court cannot determine whether this evidence would be admissible at trial. The Court recognizes the inherent prejudicial effect of presenting evidence of Plaintiff's criminal convictions. However, should Plaintiff decide to testify at the trial of this case, his credibility will be for the jury to determine. Part of that determination could be based on Plaintiff's status as a convicted felon. In the event this case proceeds to trial, Plaintiff may re-urge his Motion.

## IV. Motion for Spoliation Sanctions (Doc. 67)

Plaintiff contends he has shown that Defendants were in possession of the videotape footage of his fall on July 10, 2014. Plaintiff maintains Defendants destroyed this footage, which would have brought everything "in question into vivid clairity [sic] and would have exposed them for what they really are." (Doc. 67, pp. 3–4.) Plaintiff asserts an incident report was made, which means that the videotape footage should have been preserved. According to Plaintiff, this videotape footage would have shown exactly what he claims. Plaintiff requests that the Court sanction Defendants for the destruction of this evidence.[16]

---

[16] Plaintiff also requests that Doctor Wrobel be added back as a Defendant in this case. Plaintiff's claims against Defendant Wrobel (referred to as "Robles" in his original Complaint) were dismissed by Order

Defendants[17] assert Plaintiff cannot satisfy the bad faith requirement for spoliation, and his Motion is due to be denied. Defendants also allege that it has already been explained the video recording system used in the Pierce County Jail is a "loop type system" which records over itself every 28 to 30 days. (Doc. 69, p. 1.) Defendants maintain a request for this footage was not made until they were served with Plaintiff's Request for Production seven months after the incident and three months after this Court sanctioned service of Plaintiff's Complaint. Thus, Defendants assert, they were unaware of any need to preserve this evidence and cannot be found liable for spoliation of evidence.

---

dated December 12, 2014. (Doc. 26.) Plaintiff offers no allegations to cause this Court to reconsider that Order.

Further, Plaintiff requests that he be appointed an attorney. In this civil case, Plaintiff has no constitutional right to the appointment of counsel. Wright v. Langford, 562 F. App'x 769, 777 (11th Cir. 2014) (citing Bass v. Perrin, 170 F.3d 1312, 1320 (11th Cir. 1999)). "Although a court may, pursuant to 28 U.S.C. § 1915(e)(1), appoint counsel for an indigent plaintiff, it has broad discretion in making this decision, and should appoint counsel only in exceptional circumstances." Id. (citing Bass, 170 F.3d at 1320). Appointment of counsel in a civil case is a "privilege that is justified only by exceptional circumstances, such as where the facts and legal issues are so novel or complex as to require the assistance of a trained practitioner." Fowler v. Jones, 899 F.2d 1088, 1096 (11th Cir. 1990) (citing Poole v. Lambert, 819 F.2d 1025, 1028 (11th Cir. 1987), and Wahl v. McIver, 773 F.2d 1169, 1174 (11th Cir. 1985)). The Eleventh Circuit has explained that "the key" to assessing whether counsel should be appointed "is whether the pro se litigant needs help in presenting the essential merits of his or her position to the court. Where the facts and issues are simple, he or she usually will not need such help." McDaniels v. Lee, 405 F. App'x 456, 457 (11th Cir. 2010) (quoting Kilgo v. Ricks, 983 F.2d 189, 193 (11th Cir. 1993)).

The Court has reviewed the record and pleadings in this case and finds no "exceptional circumstances" warranting the appointment of counsel. While the Court understands that Plaintiff is incarcerated, this Court has repeatedly found that "prisoners do not receive special consideration notwithstanding the challenges of litigating a case while incarcerated." Hampton v. Peeples, No. CV 614-104, 2015 WL 4112435, at *2 (S.D. Ga. July 7, 2015). "Indeed, the Eleventh Circuit has consistently upheld district courts' decisions to refuse appointment of counsel in 42 U.S.C. § 1983 actions similar to this case for want of exceptional circumstances." Id. (citing Smith v. Warden, Hardee Corr. Inst., 597 F. App'x 1027, 1030 (11th Cir. 2015); Wright, 562 F. App'x at 777; Faulkner v. Monroe Cty. Sheriff's Dep't, 523 F. App'x 696, 702 (11th Cir. 2013); McDaniels, 405 F. App'x at 457; Sims v. Nguyen, 403 F. App'x 410, 414 (11th Cir. 2010); Fowler, 899 F.2d at 1091, 1096; Wahl, 773 F.2d at 1174). This case is not so complex legally or factually to prevent Plaintiff from presenting "the essential merits of his position" to the Court. Plaintiff's request is **DENIED**. In addition, this Court has already denied Plaintiff's previously-filed Motion for Appointment of Counsel. (Docs. 13, 14.)

[17] Defendant Spradley correctly notes it is unclear whether Plaintiff includes her in his Motion for Spoliation Sanctions. The Court still refers to Defendants in the collective.

Plaintiff's Motion is **DISMISSED** as moot. As stated previously in this Report, Plaintiff has failed to establish a genuine dispute as to any fact material to his deliberate indifference claims. In addition, Plaintiff does not dispute that he was offered medical assistance, only that he did not receive what he deemed to be proper treatment. While the Court notes Defendants may have seen this videotape footage, there is nothing before the Court indicating that this footage would have any bearing on the Court's summary judgment analysis. In the above analysis, the Report already construed Plaintiff's factual allegations in his favor and resolved all factual disputes in his favor. Consequently, even if the video supported Plaintiff's version of events, it would not affect the recommendation on summary judgment. Put another way, while the video footage may have assisted Plaintiff in convincing the jury that his version of events is true, the Court already accepts that version of events in its summary judgment analysis. Consequently the video footage would not have created a genuine dispute of material fact.

The Court also recognizes that this footage may reveal that Defendant Miller tased Plaintiff. However, as explained above, Plaintiff did not exhaust his administrative remedies as to this claim. Thus, the Court cannot entertain the merits of such a claim. Relatedly, Plaintiff filed no inmate request or grievance regarding the July 10, 2014, incident until more than two months later, which would have been after this footage was recorded over, as Defendants allege, without any intent to destroy evidence they knew or should have known was to be preserved.[18]

Thus, Plaintiff's Motion is **DISMISSED** as moot.

---

[18] The relevant portion of the current version of Rule 37 provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

## V.    Leave to Appeal *In Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis.*[19]    Though

Plaintiff has, of course, not yet filed a notice of appeal, it would be appropriate to address these

issues in the Court's order of dismissal.    See Fed. R. App. R. 24(a)(1)(A) ("A party who was

permitted to proceed *in forma pauperis* in the district-court action, . . ., may proceed on appeal *in*

*forma pauperis* without further authorization, unless the district court—before or after the notice

of appeal is filed—certifies that the appeal is not taken in good faith[.]") (italics supplied).    An

appeal cannot be taken *in forma pauperis* if the trial court certifies, either before or after the

notice of appeal is filed, that the appeal is not taken in good faith.    28 U.S.C. § 1915(a)(3); Fed.

R. App. P. 24(a)(3).    Good faith in this context must be judged by an objective standard.    Busch

v. Cty. of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999).    A party does not proceed in good

faith when he seeks to advance a frivolous claim or argument.    See Coppedge v. United States,

369 U.S. 438, 445 (1962).    A claim or argument is frivolous when it appears the factual

allegations are clearly baseless or the legal theories are indisputably meritless.    Neitzke v.

Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993).

Stated another way, an *in forma pauperis* action is frivolous and, thus, not brought in good faith,

---

(2) only upon finding that the party acted with the intent to deprive another party
of the information's use in the litigation may:

    (A) presume that the lost information was unfavorable to the party;

    (B) instruct the jury that it may or must presume the information was
    unfavorable to the party; or

    (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).    Plaintiff has not shown he meets the (1) criteria or that Defendants acted in
accordance with (2).

[19]  A Certificate of Appealability ("COA") is not required to file an appeal in a Section 1983 action.

if it is "without arguable merit either in law or fact." Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Defendants' Motions for Summary Judgment, there are no non-frivolous issues to raise on appeal, and any appeal would not be taken in good faith. Thus, the Court should **DENY** Plaintiff *in forma pauperis* status on appeal.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that the Court **GRANT** Defendants' Motions for Summary Judgment. (Docs. 54, 58.) I also **RECOMMEND** that the Court **DISMISS** Plaintiff's Complaint, **CLOSE** this case, and **DENY** Plaintiff leave to proceed *in forma pauperis* on appeal. Plaintiff's Motion in Limine and his Motion for Spoliation Sanctions are **DISMISSED** as moot. (Docs. 36, 67.)

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **fourteen (14) days** of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in

whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Clerk of Court is **DIRECTED** to serve a copy of this Report and Recommendation upon the parties.

      **SO ORDERED** and **REPORTED and RECOMMENDED**, this 8th day of February, 2016.

_____
R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA